**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALS SCAN, INCORPORATED,
              *Plaintiff-Appellant,*

v.

DIGITAL SERVICE CONSULTANTS,
INCORPORATED,
              *Defendant-Appellee,*          No. 01-1812

and

ROBERT WILKINS; ALTERNATIVE
PRODUCTS, INCORPORATED, d/b/a
abpefarc.net, individually,
              *Defendants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Alexander Harvey II, Senior District Judge.
(CA-01-496-H)

Argued: April 4, 2002

Decided: June 14, 2002

Before NIEMEYER, Circuit Judge, HAMILTON,
Senior Circuit Judge, and W. Craig BROADWATER,
United States District Judge for the Northern District of
West Virginia, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Senior Judge Hamilton and Judge Broadwater joined.

**COUNSEL**

**ARGUED:** Robert Lawrence Lombardo, Jr., Columbia, Maryland, for Appellant. Benjamin I. Fink, FREED & BERMAN, P.C., Atlanta, Georgia, for Appellee. **ON BRIEF:** Linda Woolf, GOODELL, DEV-RIES, LEECH & GRAY, L.L.P., Baltimore, Maryland, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

The question presented in this appeal is whether a Georgia-based Internet Service Provider subjected itself to personal jurisdiction in Maryland by enabling a website owner to publish photographs on the Internet, in violation of a Maryland corporation's copyrights. Adapting the traditional due process principles used to determine a State's authority to exercise personal jurisdiction over out-of-state persons to the Internet context, we hold that in the circumstances of this case, a Maryland court cannot constitutionally exercise jurisdiction over the Georgia Internet Service Provider. Accordingly, we affirm the district court's order dismissing the complaint against the Internet Service Provider for lack of personal jurisdiction.

I

ALS Scan, Inc., a Maryland corporation with its place of business in Columbia, Maryland, commenced this action for copyright infringement against Digital Service Consultants, Inc. ("Digital"), and Digital's customers, Robert Wilkins and Alternative Products, Inc. (collectively, "Alternative Products"). ALS Scan, which creates and markets adult photographs of female models for distribution over the Internet, claims that Alternative Products appropriated copies of hundreds of ALS Scan's copyrighted photographs and placed them on its websites, *www.abpefarc.net* and *www.abpeuarc.com*, thereby gaining revenue from them through membership fees and advertising. ALS Scan further alleges that Digital, as the Internet Service Provider ("ISP") for Alternative Products, "enabled" Alternative Products to publish ALS Scan's copyrighted photographs on the Internet by pro-

viding Alternative Products with the bandwidth service[1] needed to maintain its websites. ALS Scan thus alleges that all of the defendants have infringed and are infringing its copyrights within Maryland and elsewhere by selling, publishing, and displaying its copyrighted photographs.

Digital filed a motion to dismiss the complaint against it under Federal Rule of Civil Procedure 12(b)(2), asserting that the district court lacked personal jurisdiction over it. In support of its motion, Digital provided affidavits demonstrating that Digital is a Georgia corporation with its only place of business in Atlanta. Digital asserts that it is an ISP which provided bandwidth service to Alternative Products as a customer but that it is not affiliated in any way with Alternative Products except through an arms-length customer relationship. In addition, Digital states that it did not select the infringing photographs for publication; it did not have knowledge that they were posted on Alternative Products' website; and it received no income from Alternative Products' subscribers. Digital acknowledges that it does maintain its own website, *www.dscga.com*, but asserts that its website "contains no means for any person to enter into a contract with, transfer funds to, or otherwise transact business with, Digital."

Digital also states that, other than through the Internet, it has no contacts with the State of Maryland. It avers that it conducts no business and has no offices in Maryland; that it has no contracts with any persons or entities in Maryland; that it derives no income from any clients or business in Maryland; that it does not advertise in Maryland (other than through its website); and that it owns no property in Maryland.

In a responding affidavit, ALS Scan asserts that copies of its copyrighted photographs have appeared on Alternative Products' two web-

---

[1]Bandwidth in this context has been explained by the following analogy: "If you think of the Internet as the Information Superhighway, then think of bandwidth as how many lanes of traffic it can handle. Bandwidth describes how much information can be sent over a connection at one time." *See Glossary of Internet Terms: Bandwidth*, Internet for Beginners, *at* http://netforbeginners.about.com/library/glossary/bldef-bandwidth.htm (last visited May 18, 2002).

sites, *www.abpefarc.net* and *www.abpeuarc.com*. It also alleges that one of its employees in Maryland purchased an "on-line" membership to *www.abpefarc.net*, using a credit card, and, by obtaining that membership, the employee received a "user name" and a "password" to access the website. That website, it asserts, displayed ALS Scan's copyrighted photographs, allegedly in violation of the Copyright Act.

The district court granted Digital's motion to dismiss for lack of personal jurisdiction. The court found that it had neither specific nor general jurisdiction over Digital because "Digital does not engage in any continuous and systematic activities within Maryland, and there is no evidence that [ALS Scan's] claim arises out of any contacts which Digital may have with Maryland."

From the district court's ruling, ALS Scan filed this interlocutory appeal.[2]

## II

The district court's decision to dismiss the complaint against Digital for lack of personal jurisdiction presents a legal question that we review *de novo*, *see Christian Science Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001), although we review any underlying factual findings for clear error, *see In re Celotex Corp.*, 124 F.3d 619, 627 (4th Cir. 1997).

Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. *See ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997). Maryland courts have concluded that the State's long-arm statute, Md. Code Ann., Courts & Jud. Proc. § 6-103, expands Maryland's exercise of personal jurisdiction to the

---

[2]ALS Scan asserts that the district court certified its right to file an interlocutory appeal in accordance with Federal Rule of Civil Procedure 54(b), an assertion that Digital now disputes. Following oral argument, ALS Scan provided the court with a copy of the district court's June 19, 2001 order, directing that this interlocutory appeal be "transmitted to the United States Court of Appeals for the 4th Circuit." We accept this order as fulfilling the requirements of Rule 54(b).

extent allowed by the Due Process Clause of the Fourteenth Amendment. *See Androutsos v. Fairfax Hosp.*, 594 A.2d 574, 576 (Md. 1991). "Because the limits of Maryland's statutory authorization for the exercise of personal jurisdiction are coterminous with the limits of the Due Process Clause, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996). Thus, we apply the constitutional limitations on state service of process incorporated in Rule 4(k)(1)(A), and our inquiry coalesces into the question of whether Digital has sufficient minimum contacts with Maryland. *See Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 450 (4th Cir. 2000); *Ciena Corp. v. Jarrard*, 203 F.3d 312, 317 (4th Cir. 2000).

Historically, the limits on personal jurisdiction were grounded in a court's power over the actual person of the defendant. Thus, a person's "presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citing *Pennoyer v. Neff*, 95 U.S. 714, 733 (1877)). Over time, however, and with the introduction of personal service of summons or other forms of notice, the Supreme Court recognized that "due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). With respect to corporations, the Court has recognized that "unlike an individual, its 'presence' without, as well as within, the state of its origin can be manifested only by activities carried on in its behalf by those who are authorized to act for it." *Id.* Thus, "the terms 'present' or 'presence' are used merely to symbolize those activities of the corporation's agent within the state which courts will deem to be sufficient to satisfy the demands of due process." *Id.* at 316-17.

Although the courts have recognized that the standards used to determine the proper exercise of personal jurisdiction may evolve as technological progress occurs, it nonetheless has remained clear that technology cannot eviscerate the constitutional limits on a State's

power to exercise jurisdiction over a defendant. In *Hanson v. Denckla*, 357 U.S. 235 (1958), the Court explored the problem of reconciling technological advances with the limits of personal jurisdiction and stated:

> As technological progress has increased the flow of commerce between States, the need for jurisdiction over nonresidents has undergone a similar increase. At the same time, progress in communications and transportation has made the defense of a suit in a foreign tribunal less burdensome. In response to these changes, the requirements for personal jurisdiction over nonresidents have evolved from the rigid rule of *Pennoyer v. Neff* to the flexible standard of *International Shoe Co. v. State of Washington*. But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the "minimal contacts" with that State that are a prerequisite to its exercise of power over him.

*Id.* at 250-51 (internal citations omitted); *see also McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222 (1957) (noting that the trend toward expanding the permissible scope of personal jurisdiction is, in part, "attributable to the fundamental transformation of our national economy over the years"). The Court has thus mandated that limits on the states' power to exercise personal jurisdiction over nonresidents must be maintained, despite the growing ease with which business is conducted across state lines.

Determining the extent of a State's judicial power over persons outside of its borders under the *International Shoe* standard can be undertaken through two different approaches — by finding specific jurisdiction based on conduct connected to the suit or by finding general jurisdiction. *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); *Christian Science Bd.*, 259 F.3d at 216. If the defendant's contacts with the State are also the basis for

the suit, those contacts may establish specific jurisdiction. In determining specific jurisdiction, we consider (1) the extent to which the defendant "purposefully avail[ed]" itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." *See Christian Science Bd.*, 259 F.3d at 216; *see also Helicopteros*, 466 U.S. at 414 & n.8 (describing a basis for jurisdiction where "a controversy is related to or 'arises out of' a defendant's contacts with the forum").

On the other hand, if the defendant's contacts with the State are not also the basis for suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the State. To establish general jurisdiction over the defendant, the defendant's activities in the State must have been "continuous and systematic," a more demanding standard than is necessary for establishing specific jurisdiction. *See Helicopteros*, 466 U.S. at 414 & n.9; *ESAB Group*, 126 F.3d at 623.

### III

In this case, ALS Scan argues that Digital's activity in enabling Alternative Products' publication of the infringing photographs on the Internet, thereby causing ALS Scan injury in Maryland, forms a proper basis for the district court's specific jurisdiction over Digital. The question thus becomes whether a person electronically transmitting or enabling the transmission of information via the Internet to Maryland, causing injury there, subjects the person to the jurisdiction of a court in Maryland, a question of first impression in the Fourth Circuit.

Applying the traditional due process principles governing a State's jurisdiction over persons outside of the State based on Internet activity requires some adaptation of those principles because the Internet is omnipresent — when a person places information on the Internet, he can communicate with persons in virtually every jurisdiction. If we were to conclude as a general principle that a person's act of placing information on the Internet subjects that person to personal jurisdiction in each State in which the information is accessed, then the

defense of personal jurisdiction, in the sense that a State has geographically limited judicial power, would no longer exist. The person placing information on the Internet would be subject to personal jurisdiction in every State.

But under current Supreme Court jurisprudence, despite advances in technology, State judicial power over persons appears to remain limited to persons within the State's boundaries and to those persons outside of the State who have minimum contacts with the State such that the State's exercise of judicial power over the person would not offend traditional notions of fair play and substantial justice. *See Hanson*, 357 U.S. at 250-51 (noting that "it is a mistake to assume that [the technological] trend heralds the demise of all restrictions"). But even under the limitations articulated in *International Shoe* and retained by *Hanson*, the argument could still be made that the Internet's electronic signals are surrogates for the person and that Internet users conceptually enter a State to the extent that they send their electronic signals into the State, establishing those minimum contacts sufficient to subject the sending person to personal jurisdiction in the State where the signals are received. Under this argument, the electronic transmissions "symbolize those activities . . . within the state which courts will deem to be sufficient to satisfy the demands of due process." *Int'l Shoe*, 326 U.S. at 316-17. But if that broad interpretation of minimum contacts were adopted, State jurisdiction over persons would be universal, and notions of limited State sovereignty and personal jurisdiction would be eviscerated.

In view of the traditional relationship among the States and their relationship to a national government with its nationwide judicial authority, it would be difficult to accept a structural arrangement in which each State has unlimited judicial power over every citizen in each other State who uses the Internet. That thought certainly would have been considered outrageous in the past when interconnections were made only by telephones. *See, e.g.*, *Stover*, 84 F.3d at 137 (finding a defendant's "occasional telephonic requests for information from Maryland-based investigation services" to be insufficient to subject the defendant to personal jurisdiction in a Maryland court). But now, even though the medium is still often a telephone wire, the breadth and frequency of electronic contacts through computers has resulted in billions of interstate connections and millions of interstate

transactions entered into solely through the vehicle of the Internet. The convergence of commerce and technology thus tends to push the analysis to include a "stream-of-commerce" concept, under which each person who puts an article into commerce is held to anticipate suit in any jurisdiction where the stream takes the article. But the "stream-of-commerce" concept, although considered, has never been adopted by the Supreme Court as the controlling principle for defining the reach of a State's judicial power. *See generally Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102 (1987).

Until the due process concepts of personal jurisdiction are reconceived and rearticulated by the Supreme Court in light of advances in technology, we must develop, under existing principles, the more limited circumstances when it can be deemed that an out-of-state citizen, through electronic contacts, has conceptually "entered" the State via the Internet for jurisdictional purposes. Such principles are necessary to recognize that a State does have limited judicial authority over out-of-state persons who use the Internet to contact persons within the State. Drawing on the requirements for establishing specific jurisdiction, *see Helicopteros*, 466 U.S. at 414 & n.8, which requires *purposeful* conduct directed at the State and that the plaintiff's claims arise from the purposeful conduct, we adopt today the model developed in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).

In *Zippo*, the court concluded that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." 952 F. Supp. at 1124. Recognizing a "sliding scale" for defining when electronic contacts with a State are sufficient, the court elaborated:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web

site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Id.* (internal citations omitted); *accord Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1297 (10th Cir. 1999) (citing the *Zippo* standard for "passive" Web sites and thus finding a corporation's Web site an insufficient basis for an exercise of personal jurisdiction); *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999) (applying *Zippo*'s sliding scale test to the case before it); *Cybersell, Inc. v. Cybersell, Inc*, 130 F.3d 414, 418 (9th Cir. 1997) (quoting *Zippo* for the proposition that "[c]ourts that have addressed interactive sites have looked to the 'level of interactivity and commercial nature of the exchange of information that occurs on the Web site' to determine if sufficient contacts exist to warrant the exercise of jurisdiction").

Thus, adopting and adapting the *Zippo* model, we conclude that a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts. Under this standard, a person who simply places information on the Internet does not subject himself to jurisdiction in each State into which the electronic signal is transmitted and received. Such passive Internet activity does not generally include directing electronic activity into the State with the manifested intent of engaging business or other interactions in the State thus creating in a person within the State a potential cause of action cognizable in courts located in the State.

This standard for reconciling contacts through electronic media with standard due process principles is not dissimilar to that applied by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984). In

*Calder*, the Court held that a California court could constitutionally exercise personal jurisdiction over a Florida citizen whose only material contact with California was to write a libelous story in Florida, directed at a California citizen, for a publication circulated in California, knowing that the "injury would be felt by [the Californian] in the State in which she lives and works." *Id.* at 789-90. Analogously, under the standard we adopt and apply today, specific jurisdiction in the Internet context may be based only on an out-of-state person's Internet activity directed at Maryland and causing injury that gives rise to a potential claim cognizable in Maryland.

Applying this standard to the present case, we conclude that Digital's activity was, at most, passive and therefore does not subject it to the judicial power of a Maryland court even though electronic signals from Digital's facility were concededly received in Maryland. Digital functioned from Georgia as an ISP, and in that role provided bandwidth to Alternative Products, also located in Georgia, to enable Alternative Products to create a website and send information over the Internet. It did not select or knowingly transmit infringing photographs specifically to Maryland with the intent of engaging in business or any other transaction in Maryland. Rather, its role as an ISP was at most passive. Surely, it cannot be said that Digital "purposefully availed" itself of the privilege of conducting business or other transactions in Maryland. *See ESAB Group*, 126 F.3d at 623 (quoting *Hanson*, 357 U.S. at 253).

Indeed, the only *direct* contact that Digital had with Maryland was through the general publication of its website on the Internet. But that website is unrelated to ALS Scan's claim in this case because Digital's website was not involved in the publication of any infringing photographs. *See Christian Science Bd.*, 259 F.3d at 216.

Thus, under the standard articulated in this case, Digital did not direct its electronic activity specifically at any target in Maryland; it did not manifest an intent to engage in a business or some other interaction in Maryland; and none of its conduct in enabling a website created a cause of action in Maryland, although on this last point, facts would have to be developed about whether Digital continued to enable the website after receiving notice. *See ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 620 (4th Cir. 2001). This

factual issue, however, need not be resolved because Digital's conduct does not satisfy the first two prongs of the test.

Accordingly, we agree with the district court that Digital's contacts in Maryland do not justify a Maryland court's exercise of specific jurisdiction over Digital.

IV

It is not clear whether ALS Scan contends that, even if it is unable to establish specific jurisdiction over Digital, a Maryland court should nevertheless assert *general* jurisdiction over Digital. At one point in its brief, ALS Scan acknowledged that Digital's contacts with Maryland are "perhaps not extensive enough" to justify a finding of general jurisdiction. But, somewhat in tension with this acknowledgment, ALS Scan continues to argue that Digital's general contacts with Maryland through the maintenance of its own website are sufficient to justify the district court's exercise of general jurisdiction over Digital.

It is true that even in the absence of specific jurisdiction, general jurisdiction may exist when the defendant has sufficient contacts with the forum State. *See Helicopteros*, 466 U.S. at 414 & n.9. General jurisdiction may be asserted over a defendant "whose activities in the forum state have been continuous and systematic . . . . But the threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than for specific jurisdiction." *ESAB Group*, 126 F.3d at 623 (internal quotation marks and citation omitted).

We are not prepared at this time to recognize that a State may obtain general jurisdiction over out-of-state persons who regularly and systematically transmit electronic signals into the State via the Internet based solely on those transmissions. Something more would have to be demonstrated. And we need not decide today what that "something more" is because ALS Scan has shown no more.

Other than maintain its website on the Internet, Digital has engaged in no activity in Maryland, and its only contacts with the State occur when persons in Maryland access Digital's website. Even though

electronic transmissions from maintenance of a website on the Internet may have resulted in numerous and repeated electronic connections with persons in Maryland, such transmissions do not add up to the quality of contacts necessary for a State to have jurisdiction over the person for all purposes. *See GTE New Media Servs., Inc. v. Bell-South Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000) (finding that "personal jurisdiction surely cannot be based solely on the ability of District [of Columbia] residents to access the defendants' websites, for this does not by itself show any persistent course of conduct by the defendants in the District"); *Mink*, 190 F.3d at 336 (finding AAAA's website to be "insufficient to subject it to personal jurisdiction" because AAAA merely posted information about its products, provided users with a printable mail-in order form, and provided contact information for the company, including an e-mail address).

## V

For the foregoing reasons, we affirm the order of the district court dismissing the complaint against Digital for lack of personal jurisdiction.[3]

*AFFIRMED*

---

[3]ALS Scan also challenges the district court's refusal to have allowed it to engage in discovery before ruling on the jurisdictional issue. ALS Scan has failed, however, to proffer any further facts that it could demonstrate that would be material to the limited jurisdictional ruling. The district court already had ALS Scan's affidavit as well as the product of its Internet searches. Moreover, ALS Scan has not suggested that the jurisdictional facts asserted by Digital in its affidavits are inaccurate. At most, it made some conclusory allegations in support of its request for discovery. In these circumstances, we conclude that the district court did not abuse its discretion and was justified in concluding that further discovery would not aid resolution of the personal jurisdiction issue. *See Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993).